```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| NASIR FINNEMAN, | : | CIVIL ACTION |
| | : | NO. 15-1654 |
|     Plaintiff, | : | |
| | : | |
|   v. | : | |
| | : | |
| SEPTA, et al. | : | |
| | : | |
|     Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                                      April 13, 2018

This civil rights action arises out of Plaintiff's arrest at a Southeastern Pennsylvania Transportation Authority ("SEPTA")[1] station, and subsequent prosecution. Plaintiff Nasir Finneman[2] ("Finneman") alleges that Defendant Melody Campbell ("Campbell") violated his Fourteenth Amendment rights by falsely reporting to authorities that Finneman had attempted to rob and assault her. Based on Campbell's report, Finneman was arrested and spent five days in jail. Finneman now seeks damages from Campbell for malicious prosecution by initiating proceedings

---

[1] SEPTA is a regional transportation authority, created by the Commonwealth of Pennsylvania, that operates a mass-transit system within Philadelphia and its surrounding counties, as well as points in New Jersey. See Cooper v. Se. PA Transp. Auth., 548 F.3d 296, 297-98 (3d Cir. 2008) (citing 74 Pa. Cons. Stat. §§ 1701-1785).

[2] Plaintiff's original complaint identified him as "Nasir Finnerman," but his last name is actually "Finneman." See ECF Nos. 59, 91.

against him without probable cause. Following a bench trial, and pursuant to Federal Rule of Civil Procedure 52(a), this Memorandum constitutes the Court's findings of fact and conclusions of law. Ultimately, for the following reasons, the Court will enter judgment for Campbell.

I. **PROCEDURAL BACKGROUND**

Finneman filed a pro se complaint on April 7, 2015, which contained claims against various defendants. ECF No. 3. Eventually, he obtained a lawyer, and his claims went through several rounds of pleadings and dismissal before discovery began. After several motions to dismiss and amended complaints, the Defendants filed motions for summary judgment as to the remaining claims. ECF Nos. 62, 63.

The Court granted the Defendants' motions for summary judgment as to all claims except those against Campbell, ECF Nos. 70, 71, leaving Campbell as the sole remaining defendant, and malicious prosecution (under 42 U.S.C. § 1983 and the Fourteenth Amendment, as well as state law) as the only remaining claims.

The Court then held a bench trial, beginning on February 26, 2018. See ECF No. 90. There, Campbell called three witnesses: SEPTA Police Sergeant Daniel Caban, SEPTA station manager William Dicks, and Campbell herself. Finneman called

only himself as a witness. The Court has reviewed this testimony and Campbell's proposed findings of fact and conclusions of law,[3] ECF No. 96, as well as the exhibits admitted at trial. Upon this record, including credibility determinations, the Court makes its findings of fact and conclusions of law.

**II  FINDINGS OF FACT**

At the time of the incident, Campbell was employed by SEPTA as a cashier. Trial Tr. Day 2 at 138:1-4. ECF No. 96 Ex. A. As a SEPTA cashier, Campbell sold train tokens and transit passes, collected fares, and handled money. Id. at 138:5-13. On April 4, 2013, Campbell was working, alone, at the SEPTA Kensington and Allegheny station ("the Station"), which is located in a high-crime and high-drug area. Id. 4:23-25; 144:23 to 145:1. That night, Campbell was working the "late shift," which lasted from approximately 3:30 p.m. to 12:50 a.m. the next day. Id. at 138:23 to 139:24; 140:22 to 141:11. Campbell was working from inside the cashier booth at the Station, which is a small room (approximately five feet by seven feet) with one door to enter and exit. Id. at 142:19 to 143:5. This door locks automatically when it is fully closed. Id. at 147:22 to 148:5; 149:1-5. Also, the booth contains a telephone that allows on-

---

[3]  Finneman did not submit either proposed findings of fact or proposed conclusions of law, despite being granted leave to do so by March 9, 2018. See ECF No. 93.

3

duty cashiers to call the SEPTA control center and speak to a dispatcher. Id. at 146:13 to 147:3.

Passengers who want to take a train enter the Station at the ground or street level and have the option of taking the stairs or escalator up to the second level, which is the train platform level. Id. at 76:18 to 77:11. The cashier booth where Campbell was working is located on the train platform level, at the top of the stairs and the top of the escalator. Id. at 16:5-7; 79:14-17. Adjacent to the booth is a turnstile that passengers must pass through in order to enter the train platform. Id. at 77:12-25.

On April 4, 2013, at approximately 11:00 p.m., Campbell exited the cashier booth to use the restroom, which was located several feet from the booth. Id. at 150:5-25 to 151:1-12. When she exited the booth, she closed the door behind her, and it locked automatically. Id. at 151:13-21. Campbell remained in the bathroom for approximately nine minutes. See id. at 150:5-25 to 151:1-12; 153:11-21.

At approximately 11:08 p.m., Finneman entered the Station and used the escalator to go up to the train platform level. Id. at 16:5-7; 21:5-14; 79:14-17. On the escalator, Finneman noticed another person behind him on the escalator, that Finneman thought looked suspicious. Id. at 23:16-25; 24:1-6; 25:8-21. This person appeared to be a male dressed in dark

4

clothing, including a hooded sweatshirt. Id. at 22:13-15; 36:5. This person also had his hand positioned by his sweatshirt in such a way that made Finneman fear that he might "pull something," like a weapon, out from under it. Id. at 36:4-7. Approximately one minute later, Finneman proceeded through the turnstile adjacent to the cashier booth. Id. at 92:16-22; 96:20-22.

Around the same time, Campbell exited the restroom and returned to the booth. Id. at 152:4-6. There, she unlocked the door with her key and entered the booth. Id. Meanwhile, Finneman was nearby, standing on the platform facing the booth. Although Campbell tried to close the door behind her, Finneman entered the booth before she was able to do so. Id. at 105:11-15; 152:4-6; 153:11-25.[4]

The interaction between Campbell and Finneman in the booth created sufficient noise as to draw the attention of several passengers that were standing on the train platform. See id. at 152:12-15.[5] Shortly after Finneman entered the booth,

---

[4] The parties agree that this is the first time that Finneman and Campbell saw each other. See id. at 106:22-25; 193:11-12.

[5] According to Finneman, he told Campbell he was afraid of a suspicious person outside of the booth, to which Campbell replied, "Come on, he's not worrying about you," which prompted Finneman to immediately leave the booth. Id. at 36:14-17; 44:1-21.

In contrast, Campbell testified that Finneman forcibly pushed his way into the booth, and asked, "Where is it?" In response, Campbell asked, "Where is what?" and then hit Finneman, who hit her back. Id. at 152:4-20; 158:1-3. The two then struggled over her purse, causing it to rip. Id. at

5

these passengers moved towards the booth at a hurried pace. Id. Approximately thirty seconds later, Finneman exited the booth. Id. at 168:8-13.

Immediately after Finneman exited the booth, Campbell called the SEPTA control center using the telephone in the booth. Id. at 154:20 to 155:1-9. During that call, Campbell reported to the dispatcher that she had been assaulted and almost robbed. Id. After exiting the booth, Finneman remained on the train platform. Id. at 124:10-12.

A few moments later, in response to Campbell's telephone call, SEPTA Police Sergeant Daniel Caban arrived at the Station. See id. at 168:21 to 169:17. Caban passed through the turnstile and approached the cashier booth. Id. At the booth, Caban asked Campbell to identify her assailant, and she pointed out Finneman, who was still present on the train platform. Id. at 156:25 to 157:7; 168:21 to 169:17. Also, Caban observed Campbell's purse and its contents on the floor of the booth. Trial Tr. Day 3 at 7:13-24. ECF No. 96 Ex. B. Caban then approached Finneman, handcuffed him, and escorted him off of the platform. Id. at 7:3-12.

At some point thereafter, Campbell gave a written statement to Philadelphia Police Detectives, confirming the

---

154:9-19. Campbell also testified that she, fearing that Finneman was going to rob or rape her, screamed aloud to attract the group of passengers who were waiting on the platform nearby. Id. at 152:12-25.

6

details of the incident with Finneman that she had previously relayed via telephone to the SEPTA control center dispatcher. Trial Tr. Day 2 at 158:12-16; 159:3-13; see also Def. Ex. 6. Based on these events, the Philadelphia District Attorney's Office charged Finneman with robbery, criminal attempt, receiving stolen property, and simple assault. See Pl. Ex. 6. Finneman was in custody for approximately five days, before being released on bail. See Pl. Exs. 5, 6. Finneman then had a preliminary hearing regarding the charges, at which Campbell testified, and Finneman was held over for trial. Trial Tr. Day 2 at 162:8 to 163:3. However, Campbell did not return to testify at Finneman's trial, despite being under subpoena to do so, id. at 162:25 to 163:3; 189:24 to 190:1, and the Philadelphia District Attorney's Office nolle prossed the charges against Finneman. See Pl. Ex. 5.

The parties' sharply contrasting versions of what occurred when Finneman entered the booth cannot be reconciled and, therefore, they cannot both be true. The Court must decide, based on credibility, which party's version to accept.[6] When making credibility determinations regarding the testimony of witnesses, a district court considers factors including variations in demeanor and tone of voice, see Anderson v.

---

[6] Prior to the events underlying this case, Finneman had interactions with law enforcement. See Trial Tr. Day 2 at 126:15 to 131:1-25. These interactions were not related to this case, and the Court will not consider them in determining Finneman's credibility.

7

Bessemer City, 470 U.S. 564, 575 (1985); basis of knowledge, outside influence, bias, and extent to which testimony is self-serving, see Dardovitch v. Haltzman, 190 F.3d 125, 140-41 (3d Cir. 1999); evidentiary support for testimony, United States v. Kole, 164 F.3d 164, 177 (3d Cir. 1998); and whether testimony is coherent, plausible, and internally consistent. See Newark Branch, N.A.A.C.P. v. City of Bayonne, N.J., 134 F.3d 113, 120 (3d Cir. 1998).

Campbell testified that she and Finneman hit each other, Trial Tr. Day 2 at 152:4-20; 158:1-3, and struggled over her purse, causing it to rip. Id. at 154:9-19. Campbell also testified that she screamed aloud to attract the group of passengers who were waiting on the platform nearby. Id. at 152:12-25. Other evidence supports Campbell's version of the facts.

The security video clearly shows the group of nearby passengers hurrying toward the booth, just after the Finneman entered it. This supports Campbell's testimony that she screamed. Also, Caban observed Campbell's purse and its contents on the floor of the booth, mere moments after Finneman had exited it. Similarly, this supports Campbell's testimony that the parties struggled over her purse. Additionally, the fact that Campbell's call to the SEPTA control center was made immediately after Finneman exited the booth supports Campbell's

8

version of the events, because she therefore made the call while still in an excited state caused by her interaction with Finneman.[7]

Finneman claims that Campbell falsely concocted her story of assault and attempted robbery, in an effort fabricate an injury or disability and thereby obtain workers' compensation or some similar benefit. See id. at 177:20-21; 178:1-13. However, as noted, Campbell made the telephone call to the dispatcher almost instantly after Finneman exited the booth, and there simply was not sufficient time to plan such a scheme.

Finneman also claims that Campbell spoke normally to him, he did not touch her purse, and the two had no physical interaction. See id. at 36:14-17; 44:1-21. However, this testimony is undermined by other evidence. Caban observed Campbell's purse and its contents on the floor of the booth, Trial Tr. Day 3 at 7:13-24, which contradicts Finneman's version, wherein the purse was not involved. Similarly, the security video clearly shows the group of nearby passengers hurrying toward the booth, just after the Finneman entered it. The video undermines Finneman's version, wherein Finneman and Campbell spoke normally to each other, which would not have caused enough noise to draw the passengers to the booth.

---

[7] See United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001) (citing Federal Rule of Evidence 803(2)) (discussing the policy and rationale of the hearsay exception for an excited utterance).

Accordingly, there is evidentiary support for Campbell's testimony, see Kole, 164 F.3d at 177, while the evidence undermines Finneman's testimony. See id. On this basis, and considering that Campbell's testimony was coherent, plausible, and internally consistent, see Newark Branch, 134 F.3d at 120, the Court finds, by a preponderance of the evidence, that Campbell's version of what happened inside the booth is credible.

**III. CONCLUSIONS OF LAW**

To succeed on a claim for malicious prosecution under 42 U.S.C. § 1983, Finneman needs to show that 1) Campbell initiated a criminal proceeding; 2) the criminal proceeding ended in Finneman's favor; 3) the proceeding was initiated without probable cause; 4) Campbell acted maliciously or for a purpose other than bringing Finneman to justice; and 5) Finneman suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. See, e.g., Finnemen v. SEPTA, 267 F. Supp. 3d 639, 643 (E.D. Pa. 2017) (Robreno, J.) (citations omitted).

"Probable cause is proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." Telepo v. Palmer Twp., 40 F. Supp. 2d 596, 610 (E.D. Pa. 1999) (Robreno,

J.) (quoting Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993)). Probable cause means more than mere suspicion, and is "defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing the suspect had committed or was committing an offense." Id. at 610-11 (citations and internal quotations omitted).

As explained above, the Court finds that Campbell's version of what happened in the booth is credible. Because the Court has accepted Campbell's version, it has thereby found facts "sufficient to warrant a prudent [person] in believing the suspect had committed or was committing an offense," id. at 610-11 (internal quotation marks omitted), such as attempted robbery or assault. These facts include, inter alia, that Finneman struggled with Campbell for her purse. For that reason, Finneman has failed to establish that Campbell initiated the proceedings against him without probable cause under § 1983. Accordingly, his claim under § 1983 fails.

Similarly, in order to establish a malicious prosecution claim under Pennsylvania law, Finneman needs to show that Campbell instituted proceedings against him 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of Finneman. Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 249, 544 A.2d 940, 941 (Pa. 1988) (citing Miller v. Pennsylvania R.R. Co., 89 A.2d 809, 811-

11

12 (Pa. 1952)). In this context, probable cause is defined as "a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent [person] in the same situation in believing that the party is guilty of the offense." Miller, 98 A.2d at 811.

Here also, because the Court finds that the parties, inter alia, physically struggled over Campbell's purse, Campbell had "a reasonable ground of suspicion" for her statements to authorities. See Miller, 98 A.2d at 811. Therefore, Finneman has failed to establish that Campbell initiated the proceedings against him without probable cause under Pennsylvania law. Accordingly, his claim under Pennsylvania law fails.

## IV. CONCLUSION

For the reasons discussed above, the Court will enter judgment for Defendant Campbell. The Court will also deny as moot Defendant's Motion in Limine (ECF No. 88) and Defendant's Motion for Judgment as a Matter of Law (ECF No. 92).

An appropriate order follows.